IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

KRISTY LYNN GILBERT                                              PLAINTIFF

      VS.             Civil No. 2:14-cv-02205-MEF

CAROLYN W. COLVIN,
Commissioner of Social Security Administration                  DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Kristy Lynn Gilbert, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382c(a)(3). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.  Procedural Background

Plaintiff filed her application for SSI on January 30, 2012. (T. 181-189) She alleged that her disability began on January 30, 2012, due to bipolar, depression, and anxiety. (T. 225) Her application was denied initially on April 12, 2012, and upon reconsideration on June 26, 2012. (T. 62-64, 70-72) Plaintiff requested an administrative hearing (T. 73-75), and the hearing was held on September 24, 2013, before the Hon. Ronald L. Burton, Administrative Law Judge ("ALJ"). (T. 26-59) Plaintiff was present and represented by counsel at the hearing. (T. 26, 28)

Plaintiff was 24 years old at the time of the hearing. (T. 31) She had an 10th grade education and had not obtained a GED. (T. 298) She had no past relevant work ("PRW") experience. (T. 284)

-1-

Plaintiff worked at a chicken plant for about two weeks in 2010, and she had also worked in the cafeteria of Sparks Regional Medical Center for about one week. She testified that she left both of those jobs due to anxiety from being around people. (T. 38-39)

In a Decision issued on June 6, 2014, the ALJ found that although Plaintiff has the following severe impairments, history of untreated mood disorder (20 C.F.R. § 416.920(c)), Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). (T. 13-15) The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: "the claimant is limited to unskilled work involving a predictable workplace and predictable tasks, with fellow employees which are also known and predictable, and which work does not involve regularly working alongside of and dealing regularly with strangers and/or the public." (T. 15-19) With the assistance of a vocational expert, Larry Seifert, the ALJ determined that Plaintiff is able to perform the requirements of representative occupations such as hand packer (DOT 920587018/medium exertional level/svp 1), of which there are 1,464 in Arkansas and 165,838 in the nation; machine packer (DOT 920685078/medium exertional level/svp 2), of which there are 933 in Arkansas and 44,139 in the nation; and, janitor (DOT 381687078/medium exertional level/svp 2), of which there are 9,084 in Arkansas and 1,077,575 in the nation. (T. 19-20, 284-286) The ALJ then concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, from January 30, 2012 through the date of the ALJ's Decision. (T. 20)

Plaintiff appealed this decision to the Appeals Council on June 30, 2014 (T. 7), but her request for review was denied on August 20, 2014. (T. 1-4) Plaintiff then filed this action on

September 26, 2014. (Doc. 1) This case is before the undersigned pursuant to the consent of the parties. (Doc. 4) Both parties have filed appeal briefs (Doc. 8 and 9), and the case is ready for decision.

## II.  Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011).  The Court must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the Court must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

-3-

§ 1382c(a)(3)(D). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience.  *See* 20 C.F.R. § 416.920(a)(4).  Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. § 416.920(a)(4)(v).

### III.  Discussion

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff was not disabled from the date of her SSI application on January 30, 2012 through the date of the ALJ's Decision on June 6, 2014. Plaintiff raises three issues on appeal, which can be summarized as follows: (A) the ALJ failed to fully develop the record; (B) the ALJ erred in his assessment of the "paragraph B" criteria; and, (C) the ALJ erred in his RFC determination. (Doc. 8, pp. 6-14)

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and in the ALJ's opinion, and they are repeated here only to the extent necessary.

-4-

### A. No Failure to Fully Develop the Record

Plaintiff argues that "it is very possible" that there is a correlation between Plaintiff's untreated head injury at age three and the Plaintiff's current mental illness, and that "it is possible" that Plaintiff suffers from a yet to be determined neurological injury. Upon such mere possibilities, Plaintiff argues that the ALJ erred in not sending the Plaintiff for a neurological consultation. (Doc. 8, p. 7)

The ALJ has a duty to fully and fairly develop the record. *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) (ALJ must fully and fairly develop the record so that a just determination of disability may be made). This duty exists "even if ... the claimant is represented by counsel." *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992), quoting *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983). The ALJ, however, is not required to act as Plaintiff's counsel. *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994) (ALJ not required to function as claimant's substitute counsel, but only to develop a "reasonably complete" record); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial). There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis. *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for him to make an informed decision. *See Payton v. Shalala*, 25 F.3d 684, 686 (8th Cir. 1994).

The need for medical evidence does not necessarily require the Commissioner to produce additional evidence not already within the record. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient

basis for the ALJ's decision. *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001). Providing specific medical evidence to support her disability claim is, of course, the Plaintiff's responsibility, and that burden of proof remains on her at all times to prove up her disability and present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991); 20 C.F.R. § 416.912(a) and (c).

Considering the evidence as a whole in the present case, the Court concludes that the ALJ was not required to further develop the record because it was already "reasonably complete," and it contained sufficient evidence from which the ALJ could make an informed decision.

At the beginning of the administrative hearing, the ALJ inquired whether Plaintiff's counsel had an opportunity to review everything in the electronic folder. Counsel responded in the affirmative. Counsel was asked if he had any objections, and counsel advised that he had none. (T. 28-30) When asked by the ALJ, "[a]nything more recent?", counsel stated, "[n]ot at this time, your honor." (T. 30) The ALJ did leave the record open for a couple of weeks so that Plaintiff's counsel could obtain records from Sparks Regional Medical Center ("Sparks") from January, 2011 to the date of hearing to corroborate Plaintiff's testimony that she had been turned away from their emergency room on at least three occasions due to her inability to pay. (T. 35-37) No additional records from Sparks were ever provided by Plaintiff. It is significant that Plaintiff's counsel made no mention of the need for any other additional medical records, testing, or consultative examinations at the hearing or while the record remained open. See *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) ("it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about").

Plaintiff now urges, however, that the ALJ was obliged to send Plaintiff for a neurological

consult due to the possibility that there is some correlation between a head injury she reportedly suffered at age three and her current mental illness. The Court does not belief the ALJ's obligation to fully and fairly develop the record goes so far. Plaintiff testified that she received no medical treatment for the alleged head injury. (T. 44) During her stay at Lakeland Regional Hospital, Plaintiff advised that she did not receive any treatment at the time of the accident and, more importantly, she denied any problem. (T. 487, 492) There is simply no correlation made in the medical evidence of record between Plaintiff's untreated head injury at age three and her mental illness symptoms as an adolescent and adult. Further, there is no showing by Plaintiff that a neurological examination could even help to determine any such correlation. There is no ambiguity in the medical evidence of record that must be resolved; the medical evidence appears to contain all the necessary information about the untreated head injury; and, the mere possibility of such a correlation is insufficient to require the ALJ to order a neurological evaluation. *See* 20 C.F.R. § 416.912(e).

Plaintiff also complains that the ALJ did not have her tested for dyslexia or send her for a psychiatric consultation. (Doc. 8, p. 7) Plaintiff did not, however, list dyslexia as a disabling condition in support of her application for SSI benefits. (T. 225) The ALJ is not obligated to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability. *Halverson v. Astrue*, 600 F.3d 922, 934 (8th Cir. 2010). Regarding a psychiatric consultation, a consultative mental diagnostic evaluation was ordered and performed by Dr. Terry L. Efird on April 5, 2012 (T. 297-301), and a Mental RFC Assessment (T. 302-305) and Psychiatric Review Technique (T. 306-319) were performed by Dr. Christal Jannsen, a non-examining consultant, on April 11, 2012. Additionally, records from Western Arkansas Counseling and Guidance Center ("WACGC"), including a Diagnostic Evaluation done on April 24, 2012 (T.

322-326), and a Master Treatment Plan dated May 1, 2012 (T. 327-328) recommending individual psychotherapy with Jerry Stearman, ILPE, and  pharmacologic management under the supervision of James Gattis, M.D., were considered by the ALJ. (T. 16)

The evidence fully and fairly documents Plaintiff's mental impairments both before and during the relevant period, and it provides a sufficient basis for the ALJ's decision. Accordingly, the Court finds that the ALJ was not obligated to obtain even more medical evidence to develop the record further. If Plaintiff wanted to present more specific information in addition to the medical evidence of record, she had the opportunity and should have done so. *Onstad*, 999 F.2d at 1234. Reversal for failure to fully and fairly develop the record is warranted only where such failure is unfair or prejudicial. *Haley*, 258 F.3d at 748. Plaintiff has not shown that the ALJ failed to develop the record in an unfair or prejudicial manner. Plaintiff's argument on this point is rejected.

### B.  No Error in Assessment of Paragraph B Criteria

In determining that the severity of Plaintiff's mental impairment does not meet or medically equal the criteria of listing 12.04, the ALJ considered whether the "paragraph B" criteria are satisfied, and he found that they are not. While sympathetic to Plaintiff's homeless circumstances, the Court finds substantial evidence of record supports the ALJ's "paragraph B" determination.

The ALJ found that Plaintiff has mild restriction in activities of daily living, noting that according to Plaintiff's Function Report she lives alone in a tent, has no problems caring for her personal needs, prepares her own meals, does cleaning daily, mowing when it is needed, laundry once a week, and her hobbies include watching television and playing on the computer daily if possible. (T. 13) Plaintiff argues that the ALJ's assessment does not adequately reflect the evidence in the record; but, the ALJ based his determination upon information provided by Plaintiff  in her

handwritten Function Report dated February 3, 2012. (T. 242-249) Plaintiff's counsel points out that while "she may have done those things in the past," she is certainly not doing them now. (Doc. 8, p. 8) Plaintiff was, however, homeless and living in a tent at the time of her Function Report, and she nonetheless indicated her *ability* to perform those activities of daily living. *See* 20 C.F.R. § 416.920a(c)(4). The Psychiatric Review Technique form completed by Dr. Janssen on April 11, 2012 also showed only mild restriction in activities of daily living. (T. 316) Further, the only medical evidence during the relevant time period, from WACGC, does not show that Plaintiff was restricted in any way from performing activities of daily living. Accordingly, sufficient evidence supports the ALJ's finding that Plaintiff's mental impairment only mildly restricts her activities of daily living.

Concerning social functioning, the ALJ found that Plaintiff has moderate difficulties. He noted that Plaintiff goes outside everyday and can travel by walking or using public transportation; that she shops in stores for food and household items, but spends as little time as possible in the store; that she does not spend time with others or go anywhere on a regular basis; and, that she has difficulty getting along with family, friends and neighbors due to her mood swings. (T. 14) Plaintiff bristles that the ALJ's comment about "going outside everyday and traveling by walking" is callous, given that Plaintiff is homeless, lives in a tent, and has to go outside because she has no choice. While the ALJ's remarks may reflect some insensitivity for Plaintiff's circumstances, they were apparently meant to illustrate that Plaintiff is capable of some social interaction. Moreover, she reported to Dr. Efird that relationships with co-workers and supervisors have been generally satisfactory, and she denied a history of termination from employment; she reported that "the more I'm alone, my anxiety gets worse," and she described her social interactions as socializing with people at the camp and visiting with her sisters at times. (T. 298, 300) The Mental RFC Assessment

performed by Dr. Janssen on April 11, 2012 documented that Plaintiff's ability to interact appropriately with the general public, to ask simple questions or request assistance, to get along with co-workers or peers without disturbing them or exhibiting behavioral extremes, and her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited by her mental impairment, and that her ability to accept instructions and respond appropriately to criticism from supervisors was only moderately limited. (T. 304) The Psychiatric Review Technique showed only moderate difficulties in maintaining social functioning. (T. 316) Considering all of the evidence of record, the Court cannot conclude that the ALJ erred in finding that Plaintiff's mental impairment only moderately restricted her social functioning.

The ALJ similarly found that Plaintiff experienced only moderate difficulties with regard to concentration, persistence or pace. (T. 14) He pointed out that Plaintiff did not need reminders to take care of her personal hygiene or to take medications; that she was able to pay bills, count change, and handle her finances; that she could pay attention for about twenty minutes and sometimes finish what she starts. He noted her ability to follow spoken instructions very well, although she had difficulty following written instructions. He also noted that she did not handle stress well, although she could handle changes in routine. (T. 14) These observations are also based upon Plaintiff's Function Report. (T. 244, 245, 247, 248) Dr. Efird found that Plaintiff performed most basic cognitive tasks adequately; that she was able to track and respond adequately; that she generally completed most tasks during the evaluation and "[n]o remarkable problems with persistence were noted;" and, that she completed most tasks within an adequate time frame. (T. 297) Dr. Efird opined that Plaintiff had the mental capacity to persist with tasks if desired, and that she was capable of performing basic work like tasks within a reasonable time frame. (T. 297) Similar conclusions were

-10-

drawn by Dr. Janssen, with only moderate limitations being documented for sustained concentration, persistence or pace. (T. 304, 316) Sufficient evidence supports the ALJ's finding relating to Plaintiff's ability to sustain concentration, persistence or pace.

The ALJ found that Plaintiff has experienced one to two episode of decompensation, each of extended duration. (T. 14) These episodes, however, date back to August 2003, April 2004, and January 2005, well before the relevant time period beginning on January 30, 2012. There have been no periods of decompensation during the relevant time period. This is reflected in Dr. Janssen's Psychiatric Review Technique form. (T. 316)

As Plaintiff's mental impairment does not cause at least two "marked"[1] limitations, or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ found that the "paragraph B" criteria are not satisfied. Considering the evidence of record as a whole, the Court agrees. Plaintiff's argument on this point fails.

### C.  No Error in RFC Determination

Plaintiff's final point is that the ALJ erred in finding that Plaintiff has the RFC to perform a full range of work at all exertional levels, with some non-exertional limitations, and secondarily, that the ALJ erred in not considering the side effects of medications taken by the Plaintiff. (Doc. 8, pp. 11-14) Plaintiff accuses the ALJ of "laying blame on the Plaintiff for the lack of medical records stating she is unable to work;" and, that in finding Plaintiff's symptoms improve when she is on her medications, the ALJ determined that Plaintiff "should have worked harder at obtaining her

---

[1] A limitation is considered "marked" if it is "more than moderate but less than extreme," and a "marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404 Subpt. P, App. 1, § 12.00(C), citing §§ 404.1520a and 416.920a.

medications." (Doc. 8, p. 11) Plaintiff seeks to excuse her lack of diligence in seeking mental health treatment because of the nature of mental illness itself, citing *Benedict v. Heckler*, 593 F.Supp. 755, 761 (E.D.N.Y. 1984). (Doc. 8, p. 12) Plaintiff also asserts that her inability to pay for mental health treatment was not properly considered by the ALJ. (Doc. 8, p. 12)

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 416.945(a)(1). It is defined as the individual's maximum remaining ability to do sustained work activity in an ordinary work setting "on a regular and continuing basis." 20 C.F.R. § 416.945; Social Security Ruling (SSR) 96-8p. It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Cox v. Astrue*, 495 F. 3d 614, 619 (8th Cir. 2007), citing *Lauer v. Apfel*, 245 F.3d at 704; *Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. 20 C.F.R. §§ 416.927(e)(2), 416.946.

Up until a couple of visits to WACGC three months after filing her application for SSI benefits, the evidence of record here shows that Plaintiff had not sought and received mental health treatment since she was a juvenile.

Before reaching age 18, Plaintiff had been admitted to Lakeland Regional Hospital in August 2004. (T. 478) Plaintiff was age 14 at the time. She was "not functioning well in any setting," and she had taken a knife to her wrists in February 2002 in a suicide gesture. (T. 478) Individual, group, family, and activity therapy, as well as the therapy of the RTC Unit milieu, was provided, and medications were prescribed. (T. 478-479) Plaintiff was discharged home on January 14, 2004, with diagnoses of major depressive disorder, recurrent, moderate; oppositional defiant disorder; marijuana abuse; and, borderline personality disorder. Her GAF on discharge was estimated at 40. (T. 479-480)

She was admitted to Pinnacle Pointe Hospital on April 18, 2004 due to problems with suicidal ideation and physical aggression. She was age 15. (T. 356) During her stay, she attended individual, family and group therapy; and, while initially resistant, she made progress toward identification of her problems and demonstrated increased coping skills as her treatment continued. She was discharged to a less restrictive level of care on April 30, 2004, with diagnoses of bipolar disorder, mixed, moderate to severe without psychosis; disruptive behavior disorder, NOS; parent/child relationship problems; and, nicotine dependence. Her GAF on discharge was estimated at 40. Medications at the time of discharge were Lithium and Gabitril. No activity restrictions were recommended. (T. 357-358)

On January 5, 2005, Plaintiff was admitted to Willow Crest Hospital under a court order. She was age 16. (T. 336) Her outpatient counselor thought Plaintiff was worsening in regard to her depression and her ability to be successful at home and school. (T. 336) She had become obsessed

-13-

with her mother's health (who was struggling with a terminal illness), so much so that she slept in the same room as her mother due to the fear of leaving her, and she often refused to go to school. (T. 357) Modification of her pre-admission medications was pursued, but then discontinued due to Plaintiff's noncompliance. She was restarted on her pre-admission medication, Risperdal, at a lower dose. (T. 337) Plaintiff made "noticeable forward progress" in treatment. She showed improved self-esteem; an improved ability to regain confidence after dealing with negativity; an improved ability to express her feelings; an improved ability to maintain positive interactions with peers and to ignore negativity; and, her mood was improved. (T. 338) Despite initial hostility, Plaintiff's mother began to encourage Plaintiff to make positive progress, and they worked on resolving issues between them, discussed the mother's illness, and they worked on plans for Plaintiff's future. At the time of discharge, Plaintiff felt confident in returning home with her mother. (T. 338-339) Plaintiff was discharged to the custody of her mother on June 4, 2005. Discharge diagnoses were bipolar disorder, most recent episode depressed; oppositional defiant disorder; nicotine abuse; and, borderline intellectual functioning. Her GAF was estimated to be 55. (T. 336) At the time of her discharge, she was taking Lithium, Risperdal and Abilify. Plaintiff's prognosis was noted to be fair, and outpatient therapy was scheduled through Vista Health. (T. 339)

There are no records of any mental health treatment from Plaintiff's discharge from Willow Crest Hospital on June 4, 2005 up until her two appointments at WACGC on April 24, 2012 and May 1, 2012. Plaintiff testified that she had not received any mental health treatment since she was a juvenile. (T. 33)

During her assessment at WACGC on April 24, 2012, Plaintiff, then age 23, presented as somewhat apathetic; her speech quantity and quality were normal; while she rated her distress as

severe, no signs of distress were noted during the interview; her thoughts were logical; she had a lot of thoughts about the death of her parents in the last couple of years; there were no delusions or hallucinations; she was oriented x 3; her intelligence was estimated to be average; her abstracting ability was normal; and, her judgment and insight were noted to be fair. (T. 324) She reported no mental health treatment since 2007 because she turned 18 and "lost her Medicaid." She advised that she was homeless, and that she had been getting support from the Rescue Mission and the Next Step Day Room. (T. 325) WACGC diagnosed Plaintiff as having bipolar I disorder, most recent episode mixed, severe without psychotic features. A GAF of 56, "[m]oderate symptoms," was assessed. (T. 325) When asked what she hoped to get from treatment, Plaintiff responded, "[t]o get my meds and have someone to talk to," and "I would not be sad, lonely and would be happy." (T. 325) The need for a psychiatric evaluation to assess the need for continued meds for bipolar disorder was documented, and individual therapy was recommended. (T. 325)

In WACGC's Master Treatment Plan prepared May 1, 2012, outpatient care consisting of individual psychotherapy 1-2 times monthly with Jerry Stearman, ILPE, and pharmacologic management 1-2 times quarterly by James Gattis, M.D. was recommended. (T. 327-328) Plaintiff testified that WACGC made another appointment for her, but without insurance or money, there was no way she could fill the prescriptions for the medications. She stated that she tried to contact WACGC "at least a handful" of times, and that she was told to go to the emergency room. (T. 33-34) There is no record of any such calls to WACGC in their treatment records. Plaintiff also testified that she went to the Sparks emergency room at least three times, that "[t]hey checked me in, took all my vitals, took the history and everything," and that without insurance or money "there was nothing they could do." (T. 35) As mentioned previously, the ALJ kept the record open to allow Plaintiff's

-15-

counsel an opportunity to obtain the emergency room records from Sparks to verify this (T. 37), but no such records from Sparks were ever submitted.

It is well established that an ALJ may properly consider the claimant's noncompliance with a treating physician's directions, *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001), including failing to take prescription medications, *Riggins,* 177 F.3d at 693, and to seek treatment, *Comstock v. Chater*, 91 F.3d 1143, 1146-47 (8th Cir. 1996). *See also Banks v. Massanari*, 258 F.3d 820, 825-26 (8th Cir. 2001) (ALJ properly discounted claimant's complaints of disabling depression as inconsistent with daily activities and failure to seek additional psychiatric treatment). Pursuant to 20 C.F.R. §§ 416.930(a) and (b), a claimant won't be found disabled if she refuses to follow prescribed medical treatment without a "good reason." *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Brown v. Heckler*, 767 F.2d 451 (8th Cir. 1985).

Plaintiff submits that one "good reason" for her not consistently seeking mental health treatment relates to the very nature of mental illness itself. In *Benedict v. Heckler*, cited by Plaintiff, Judge Wexler observed that, "[i]n cases involving the mentally ill, 'justifiable cause' must be given a more lenient, subject definition." *Id*. 593 F.Supp. at 761. In that case, the claimant had become increasingly paranoid, especially of taking medications, because he had overdosed "quite horribly" on the prescription Stelazine erroneously given to him at a VA hospital. *Id*. The Court there found that after such an experience even the most reasonable individual might be wary of taking medication, and that certainly a psychologically disturbed person would justifiably refuse such medication, being less able to realistically assess the risks and benefits. *Id*. There are no such circumstances in the record of the present case. To the contrary, Plaintiff testified that taking prescription medications helped to minimize her symptoms (T. 50), and during her last

hospitalization in 2005 it was documented that "[s]he was tolerating all medications without significant side effects." (T. 338) Accordingly, the facts here do not support a finding that the nature of Plaintiff's mental illness itself provides "good cause" for her failure to consistently seek mental health treatment.

Plaintiff also asserts that she has sought treatment and been denied due to her inability to pay for such treatment. A lack of funds may justify a failure to receive medical care. *Osborne v. Barnhart,* 316 F.3d 809, 812 (8th Cir. 2003). A lack of funds alone, however, will not excuse a claimant's failure to obtain treatment or to follow medical advice. The Secretary's regulations also provide that a claimant who fails to treat a remediable condition without good reason is barred from entitlement to benefits. 20 C.F.R. § 416.930. Generally speaking, a lack of evidence that a claimant attempted to find any low cost or no cost medical treatment for her alleged pain and disability is inconsistent with a claim of disabling pain. *Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992). The record shows that Plaintiff received support from the Community Rescue Mission and The Next Step Day Room (T. 322). The ALJ noted this, and he commented that Plaintiff is, therefore, "familiar with organizations that are available to provide assistance." (T. 17) The Court notes that these organizations are located only a short distance from the Good Samaritan Clinic which provides on-site affordable health care for the working poor, children, the elderly, and the homeless. Plaintiff's failure to contact the Good Samaritan Clinic, or any other clinics offering services to the poor and uninsured, prevents us from concluding that her financial status excuses her failure to obtain consistent mental health treatment. We also note that except for Plaintiff's testimony on this point, the record does not document that Plaintiff was ever refused treatment due to her inability to pay for services or medications; the treatment records from WACGC do not evidence the

six or seven calls Plaintiff claims to have made to them, nor are there any records from Sparks emergency room to verify Plaintiff's claims that she was turned away on three occasions due to an inability to pay.

Plaintiff next argues that the ALJ implies that if Plaintiff "could just get back on her medication, then she would be able to work," but that the ALJ failed to consider the side effects of Plaintiff's medications. (Doc. 8, p. 13) Plaintiff testified that her medication made her a "zombie," and that she "literally slept all the time." (T. 53) Although there was concern at Willow Crest about the side effects of Risperdal, including hyperprolactinemia and weight gain, this medication was requested by Plaintiff and her mother, and with careful adjustment of dosage Plaintiff decreased her weight by 37 pounds and "was free of any significant side effects." (T. 338) More recently, the evidence shows that Plaintiff has not taken any medications since she was a juvenile (T. 37), and she made no mention of adverse side effects from any medications in her Diagnostic Evaluation at WACGC. (T. 322-325) Consequently, Plaintiff's allegation that side effects of medication render her unable to work lacks evidentiary support.

"If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004); see also 20 C.F.R. § 416.930(b). Here, the ALJ found that "the medications were relatively effective in controlling the claimant's symptoms," and that while Plaintiff states that she is unable to afford medication, "there is no indication she has sought any assistance in the years since she turned eighteen obtaining her medications." (T. 17) These findings are adequately supported in the record.

The ALJ points out that there is no record of a treating physician offering an opinion on the Plaintiff's ability to work and that no restrictions have been recommended by any treating physician.

-18-

(T. 17) The ALJ also notes that Plaintiff had GAF scores between 56 and 65 on her available treatment records since she turned eighteen. Such scores reflect only moderate to mild symptoms, however, the ALJ did not find GAF to be a reliable measure of functional ability as GAF scores reveal only a picture in time and do not necessarily correlate with disability. (T. 17) This finding is consistent with current analysis under the DSM-V. We recognize that the DSM–V was released in 2013, replacing the DSM–IV. The DSM–V has abolished the use of GAF scores to "rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13–CV–01074–NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing *Rayford v. Shinseki,* 2013 WL 3153981, at *1 n. 2 (Vet.App.2013) (quoting the DSM–V)). However, because the DSM–IV was in use at the time the medical assessments were conducted in this case, the GAF scores remain relevant for consideration in this appeal. *Rayford*, 2013 WL 3153981, at *1 n. 2.

As for opinion evidence, the ALJ discussed the April 5, 2012 opinion of Dr. Terry Efird, a psychological consultative examiner, finding it supported by the objective medical evidence of record and his examination of Plaintiff. (T. 18) Commenting that "[a] degree of exaggeration appears to be present," Dr. Efird diagnosed Plaintiff with depressive disorder NOS, anxiety disorder NOS, and personality disorder NOS with borderline and histrionic traits. He estimated her GAF at 55-65. (T. 299-300) Regarding the effects of Plaintiff's mental impairments on her adaptive functioning, Dr. Efird concluded that: Plaintiff had the capacity to perform basic cognitive tasks required for basic work-like activities; she appeared able to track and respond adequately; no remarkable problems with persistence were noted; and, she appeared to be capable of performing basic work-like tasks within a reasonable time frame. (T. 300)

The ALJ also considered the Mental RFC Assessment performed by Dr. Christal Janssen, a state agency medical examiner. (T. 18) Dr. Janssen found that Plaintiff was able to perform work where interpersonal contact is incidental to the work performed; complexity of tasks is learned and performed by rote, with few variables and little judgment; and, where supervision required is simple, direct and concrete. (T. 304)

Finding that the opinions of both Drs. Efird and Janssen were supported by the evidence as a whole, the ALJ gave great weight to their expert opinions in his determination of Plaintiff's RFC. (T. 18-19) He considered, but gave little probative weight, to the Plaintiff's testimony, stating that "the paucity of evidence does not support the clamant's ultimate allegation of disability." (T. 19) Noting Plaintiff's activities of daily living, in conjunction with the medical evidence demonstrating minimal abnormalities, the ALJ concluded that Plaintiff retained a significant functional capacity and was not an individual unable to sustain regular and continuing work due to her mental impairments. (T. 19) In reaching the conclusion that Plaintiff could perform work at all exertional levels, but with the non-exertional limitations of performing unskilled work involving a predictable workplace and predictable tasks, with fellow employees who are also known and predictable, and which work does not involve regularly working alongside of and dealing regularly with strangers and/or the public, the ALJ properly considered the expert opinions, the Plaintiff's subjective complaints and symptoms, the objective medical evidence of record, and the factors set forth in *Polaski v. Heckler*, 729 F.2d 1320, 1322 (8th Cir. 1984). Substantial evidence supports the ALJ's RFC determination.

## IV.  Conclusion

Having carefully reviewed the record, the Court finds substantial evidence supporting the

ALJ's Decision denying Plaintiff SSI benefits. The ALJ's decision should be, and it hereby is, affirmed. Plaintiff's Complaint should be dismissed with prejudice.

DATED this 11th day of September, 2015.

/s/ Mark E. Ford

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE